IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Phillip S. Figa

Civil Action No. 04-cv-02409-PSF-CBS

CENTER FOR NATIVE ECOSYSTEMS; and
BIODIVERSITY CONSERVATION ALLIANCE,

    Plaintiffs,

v.

RICK CABLES, in his official capacity as Regional Forester, Region 2,
United States Forest Service; and
UNITED STATES FOREST SERVICE,

    Defendants,

POLE MOUNTAIN CATTLEMEN'S ASSOCIATION,
an Unincorporated Association, and its members; BATH
SISTERS, LLC, a Wyoming Limited Liability Company;
MARK EISELE; WARREN LIVESTOCK, LLC, a
Wyoming Limited Liability Company; PETER HANSEN;
BONHAM RANCH, LLC, a Wyoming Limited Liability
Company; C.C. DAVIS & CO., LLC, a Wyoming
Limited Liability Company; FERGUSON RANCH, INC.,
a Wyoming Corporation; GARDNER BROS.;
WILLADSEN BROS.; QUARTER CIRCLE F QUARTER
CIRCLE LONE TREE RANCH, INC., a Wyoming Corporation;
WYOMING STOCK GROWERS ASSOCIATION,
a nonprofit Wyoming Corporation on behalf of its members,
LARAMIE COUNTY FARMERS UNION, a nonprofit
Wyoming Corporation on behalf of its members, and
WYOMING FARM BUREAU FEDERATION, a nonprofit
Wyoming Corporation on behalf of its members,

    Defendants-Intervenors

WYOMING ASSOCIATION OF CONSERVATION
DISTRICTS, a nonprofit Wyoming Corporation on behalf of
its members,

    Defendants-Intervenor.

**ORDER ON PETITION FOR REVIEW**

THIS MATTER is before the Court on Plaintiffs' Petition for Review of Agency Action (Dkt. # 34), filed April 29, 2005. All parties have responded and replied, and the issue is fully briefed. Additionally, the Administrative Record is on file with the Court (Dkt. # 17).

**I.    BACKGROUND AND PROCEDURAL HISTORY**

On November 19, 2004, Center for Native Ecosystems, Biodiversity Conservation Alliance, and Forest Guardians (collectively "CNE") filed a Complaint for Declaratory and Injunctive Relief (Dkt. # 1) against Rick Cables, in his official capacity as Regional Forester, and United States Forest Service.

CNE filed an amended complaint on December 15, 2004 (Dkt. #5), challenging Forest Service decisions to approve livestock grazing in the Pole Mountain Area of the Medicine Bow National Forest in Wyoming and seeking declaratory and injunctive relief.

CNE alleges that the approvals violate Wyoming's water quality standards, the Clean Water Act ("CWA"), 33 U.S.C. § 1251, *et seq.*, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06, and the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq. Defendant Forest Service filed a Partial Answer on February 18, 2005 (Dkt. # 14), denying the plaintiffs' ESA substantive allegations. The Forest Service then moved to dismiss CNE's first claim for relief which arose under the CWA and APA

(Dkt. # 19), filed February 22, 2005, on the basis of F.R.Civ.P. 12(b)(1), lack of subject matter jurisdiction.

Meanwhile, two groups sought to intervene as defendants in this action. On March 3, 2005, Pole Mountain Cattlemen's Association together with several individual member grazing permittees (collectively, "Cattlemen") filed a Proposed Intervenor-Defendant Pole Mountain Cattlemen's Association's Application to Intervene (Dkt. # 21).  Plaintiffs' Response to Motion to Intervene (Dkt. # 27), filed March 23, 2005, did "not oppose intervention."  Pl.'s Resp. to Mot. to Interv. at 1.

The Wyoming Association of Conservation Districts ("WACD"), the Wyoming Stock Growers Association, the Laramie County Farmers Union, and the Wyoming Farm Bureau Federation filed a Motion to Intervene on April 1, 2005 (Dkt. #30).  The parties later reached a Stipulation on Wyoming Association of Conservation Districts, Wyoming Stock Growers Association, Wyoming Farm Bureau Federation and Laramie County Farmers Union's Motion for Intervention (Dkt. # 33), filed April 18, 2005.  The Stipulation agreed to allow WACD to intervene "with regard to the First Cause of Action of Plaintiff's Amended Complaint" and that the other proposed intervenors "shall be represented as part of the Pole Mountain Cattlemen's Association et al.'s Intervenor group . . . ."  Stip. at 1.

Cattlemen and WACD each filed a Motion to Dismiss (Dkt. # 36 and Dkt. # 38, respectively) on April 29, 2005.  Each Motion sought dismissal of CNE's first claim for relief only, which alleged violations of the CWA and the APA.

CNE sought a Petition for Review (Dkt. # 34), filed April 29, 2005, asking this Court to review the Forest Service approval of livestock grazing in the Pole Mountain area and seeking an Order vacating the approvals. On June 7, 2005, Intervenor-Defendants Cattlemen and Intervenor-Defendants WACD each filed responses (Dkt. # 49 and Dkt. # 50, respectively). Defendant Forest Service filed its Response on June 10, 2005 (Dkt. # 54).

By Order dated September 29, 2005 (Dkt. # 63, amended by Dkt. # 64), this Court granted the applications to intervene and denied all motions to dismiss. Additionally, a hearing was held on the Petition for Review on Tuesday, October 18, 2005 at 8:30 a.m. Parties attended two settlement conferences before Magistrate Judge Shaffer, on December 7, 2005 and again on December 15, 2005. On January 3, 2006, Magistrate Judge Shaffer issued a Minute Order certifying that no realistic possibility of settlement remained (Dkt. # 69).

This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, as CNE brings this action under the Administrative Procedure Act, specifically 5 U.S.C. § 706, and the citizen suit provision of the Endangered Species Act, 16 U.S.C. § 1540(g). Jurisdiction also lies under 28 U.S.C. § 1346, United States as defendant.

## II.   PETITION FOR REVIEW

Plaintiffs challenge Forest Service decisions to approve livestock grazing in the Pole Mountain allotments of Medicine Bow National Forest in Wyoming, alleging that they violate both the Clean Water Act and the Endangered Species Act, and are arbitrary and capricious under the Administrative Procedure Act. Their Petition

requests the Court to vacate the livestock grazing approvals and declare them unlawful. Pet. at 1.

Specifically, CNE alleges that the Forest Service is violating § 313 of the CWA, 33 U.S.C. § 1323(a)(1), which requires federal agencies to "comply with . . . all state . . . and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner and to the same extent as any nongovernmental entity." *Id.* at 2 (citing 33 U.S.C. § 1323(a)(1)).

CNE also alleges violations of § 7 of the ESA, 16 U.S.C. § 1536(a)(2), which requires federal agencies to consult with the U.S. Fish & Wildlife Service ("FWS") whenever it undertakes activities that may affect a listed species or its designated critical habitat. *Id.* at 3. This consultation duty becomes a duty to *re*consult if "new information" not previously considered arises, or if the consulted action is "subsequently modified" in a manner not previously considered. *Id.* at 4 (citing 50 C.F.R. § 402.16). The Pole Mountain area is used for public recreation and also provides habitat for important natural resources, including the Preble's meadow jumping mouse. *Id.* On May 13, 1998, FWS listed this mouse as an endangered species, and later designated mouse "critical habitat" in areas within Pole Mountain on June 23, 2003. *Id.* at 4-5.

## A.     Alleged Clean Water Act Violations

Livestock grazing is specifically authorized by the Forest Service through three types of decisions:  Grazing Permits, Allotment Management Plans ("AMPs"),[1] and Annual Operating Instructions ("AOIs").  The ten-year permits are issued for an entire allotment and establish the maximum number of livestock and the seasons of use.  Pet. at 5.  AMPs are incorporated into the grazing permits, dividing each allotment into pastures and prescribing certain measures applicable to specific range conditions.  *See* Forest Serv. Resp. at 3-5.  AOIs are issued to permittees prior to each grazing season.  They establish specific dates, rotations, the number of livestock permitted for the season, monitoring requirements, and forage use limits.  Pet. at 5.

The Forest Service issued grazing permits for the seven allotments in the Pole Mountain area between May 1999 and June 2004.  The AMP for each allotment was issued in May 1999 and is still in effect.  The Forest Service issues the AOIs each spring.  *Id.* at 6.

CNE alleges that the Forest Service was aware of adverse impacts from livestock grazing as early as 1996, when state investigation labeled creeks within Pole Mountain as "functioning" but "at risk" due to grazing.  *Id.*  More recent water sampling revealed fecal coliform levels in Pole Mountain creeks that violate state water quality standards.  *Id.*  CNE argues that the livestock grazing also threatens the habitat for the Preble's meadow jumping mouse.  *Id.* at 6-7.  The impact on both the water quality and

---

[1]   An allotment is a "designated area of land available for livestock grazing."  Forest Serv. Resp. at 4. n.4 (quoting 36 C.F.R. § 222.1(b)(1)).  The Pole Mountain area consists of seven allotments.  Pet. at 6.

the mouse habitat has been exacerbated by recent drought conditions. *Id.* at 8. Additionally, CNE alleges that the Forest Service has violated its own "forage utilization standard" for grazing in the Medicine Bow National Forest. *Id.* at 8-9.

The Forest Service has undertaken voluntary measures in response to fecal coliform contamination and other harmful impacts of livestock grazing. CNE maintains that the voluntary measures–asking permittees to voluntarily limit livestock and to otherwise alter their grazing management–have been "largely ineffective" and continue to produce violations of utilization standards and water quality standards. *Id.* at 9-10.

In light of what it considers to be the ineffectiveness of the voluntary measures and the approval of continued livestock grazing by the Forest Service, CNE contends that the Forest Service is violating § 313 of the CWA because it is violating Wyoming's state standard for fecal coliform concentrations. *Id.* at 14 (citing Ch. 1, § 27 of Wyoming's Water Quality Rules and Regulations) ("During the entire year, fecal coliform concentrations shall not exceed a geometric mean of 200 organisms per 100 milliliters (based on a minimum of not less than 5 samples obtained during separate 24 hour periods for any 30 day period), nor shall the geometric mean of 3 separate samples collected within a 24 hour period exceed 400 organisms per 100 milliliters in any Wyoming surface water."). CNE notes that violations of the Wyoming standard were first documented in 2002 on North Branch North Fork Crow Creek in Pole Mountain. *Id.* at 15. In 2003 and 2004, the standard was exceeded again on North Branch North Fork Crow Creek and also in 2003 on Middle Crow Creek. *Id.*

CNE alleges that authorizing livestock grazing in the face of these continued exceedances violates § 313 of the CWA and that issuing AOIs in 2003 and 2004 is arbitrary. The Forest Service is acting contrary to evidence before the agency and has failed to consider the ongoing fecal pollution in issuing its AOIs.

### B.  Alleged Endangered Species Act Violations

The Forest Service has consulted with FWS regarding grazing impacts on the endangered Preble's meadow jumping mouse. The Forest Service concluded that livestock grazing "may affect," but is "not likely to adversely affect" the mouse, despite evidence that the grazing will directly affect the mouse by "reducing the density and height of moist, lowland grasses." *Id.* at 11. FWS concurred with this 1998 determination. *Id.* at 17. However, this determination was "premised on compliance with the forage utilization standard." *Id.* at 11. Thus, CNE contends that the Forest Service must reconsult as to the impact on the mouse in light of violations of the forage utilization standard. Additionally, the Forest Service must reconsult as to the impact of grazing on the mouse's newly-designated (as of 2003) critical habitat. *Id.* at 18.

The Forest Service informally consulted with FWS between December 2004 and January 2005, after the filing of this Complaint. *Id.* at 18-19. This informal consultation led to a conclusion by the Forest Service that existing AMPs were not likely to adversely affect the mouse or its habitat. However, this conclusion was allegedly based on the Forest Service's claim of meeting forage utilization standards in 2004. *Id.* at 19. CNE challenges this claim. According to CNE, the utilization standard violations from 1999 and 2003 were measured by assessing "key areas," but in 2004, the Forest

Service chose to average the utilization rates across an entire allotment. *Id.* at 12. This allegedly results in an "about-face without any reasoned or rational explanation [that] is arbitrary and capricious under the APA." *Id.* at 22 (citing *Exxon v. Lujan*, 970 F.2d 757, 762 n.4 (10th Cir. 1992) (upholding agency's action because the agency "provide[d] sufficient explanation for a change in agency policy," but noting that an agency changing course "is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance")).

CNE also claims that the recent informal consultation was insufficient because it did not consider the impact of livestock grazing on mouse recovery as mandated by ESA. *Id.* at 19. According to CNE, the purpose of ESA is not only to forestall extinction, but also "through critical habitat designations and the section 7 consultation process . . . to recover imperiled species." *Id.* (citing *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1070 (9th Cir. 2004)).

The conclusion of the informal consultation is also allegedly flawed because it is not supported by the evidence or the best available scientific information, and is thus arbitrary. Pet. at 21. The Forest Service manipulated the measurement used to obtain utilization rates, *id.* at 21-22, while key areas continued to violate the standard. *Id.* at 23. Regardless, the Forest Service stands accused of not having shown compliance with the forage utilization standard actually protects the mouse or its habitat. *Id.* FWS, in fact, previously (and indirectly) found the standard inadequate to protect the mouse and its habitat. *Id.* at 23-24 (citing 63 Fed. Reg. at 26526 (May 13, 1998)

(noting "the inherent weakness or non-application of the existing laws and regulations that could serve to protect Preble's and its habitat")).

Based on the arguments above, CNE requests the Court to "vacate and set aside the Forest Service's grazing approvals that violate the CWA, ESA, and APA." *Id.*

### III.   FOREST SERVICE'S RESPONSE BRIEF

The Forest Service essentially argues that its grazing permits do comply with Wyoming law, which regulates the type of pollution at issue (nonpoint source pollution) through a voluntary Best Management Practice ("BMP") program. Forest Service Resp. at 6. The ESA claims should also fail because the Forest Service has complied with its reconsultation duties under § 7. Other ESA claims "are not properly before the court because they were not contained in the 60 day notice letters, no [sic] raised during the administrative appeals process, and were not included in CNE's Complaint." *Id.* at 2.

#### A.   CWA Claim

Wyoming Water Quality Standards, cited by CNE as establishing a numerical standard, also provides the following regulation of nonpoint source pollution (which includes pollution from livestock grazing; *see Oregon Natural Desert Ass'n v. Dombeck*, 172 F.3d 1092, 1099 (9th Cir. 1998)):

> The numerical and narrative standards contained within these regulations shall be used to establish effluent limitations for those discharges requiring control via permits to discharge in the case of point sources and best management practices in the case of nonpoint sources. If no permit or best management practice has been issued or implemented for a pollution source the state may, in addition to other appropriate legal action, take direct action to enforce these standards.

Ch. 1, § 5, Wyoming Water Quality Standards. The BMPs are further explained:

> "Best management practices (BMPs)" means a practice or combination of practices that after problem assessment, examination of alternative practices, and in some cases public participation, are determined to be the most technologically and economically feasible means of managing, preventing or reducing nonpoint source pollution.

Ch. 1 § 2(b)(v), Wyoming Water Quality Standards. Thus, the Forest Service notes that a "voluntary approach to nonpoint source control is emphasized" and that to be actionable, violators must exceed the water quality standard and exhibit a lack of good faith in implementing a BMP. Forest Serv. Resp. at 6-7. Because the Forest Service has implemented BMPs in good faith, there is no violation of Wyoming law or of § 313 of CWA.

In support of its position that it is complying in good faith with Wyoming's requirements, the Forest Service notes that "there was no evidence to suggest that water quality degradation from livestock feces had occurred" when it prepared the Environmental Assessment for the Pole Mountain AMPs in 1998. *Id.* at 13. Thus, the Forest Service did not require water quality monitoring in Pole Mountain. *Id.* However, the Forest Service did impose BMPs to protect water quality by using a deferred rotation approach, *inter alia*. *Id.* at 13-14.

Drought conditions beginning in 2000 prompted the Forest Service to take action–which it did by issuing Drought Letters to permittees advising them of the drought and the need to adjust accordingly. *Id.* at 14-15. After 2002 testing revealed fecal coliform violations on North Branch North Fork Crow Creek, the Forest Service reduced stock numbers allowed under grazing permits and reduced the total number of "head months" in this allotment. *Id.* at 16-17.

The Forest Service also met with the Wyoming Department of Environmental Quality ("WDEQ") and a grazing association to discuss the water quality issue on January 26, 2004, and again on February 23, 2004, and again on August 27, 2004.[2]  *Id.* at 18.  This consultation resulted in a joint Water Quality Monitoring Plan with WDEQ and various conservation districts.

The Forest Service concludes that "elevated fecal coliform levels . . . are confined to two localized areas . . . and are not a widespread problem on the Pole Mountain allotments."  *Id.* at 20.  It notes that drought conditions have exacerbated any grazing problem.  Additionally, the Forest Service has entered into a Memorandum of Understanding ("MOU") with the local conservation districts to develop a watershed plan that will address heightened pollution in certain areas.  *Id.* at 21.  Finally, Wyoming itself has labeled the affected streams as "low priority" for development of a Total Maximum Daily Load while the Forest Service and others address the issue, a label approved by the Environmental Protection Agency.  *Id.* at 21-22.

In addition to the Forest Service's contentions that it prevails on the merits, it also challenges jurisdiction for the CWA claim, alleging that CNE failed to challenge specific agency decisions and failed to exhaust administrative remedies.  *Id.* at 26-29. Additionally, the Forest Service claims that challenges to past AOIs (the yearly use instructions) are moot as soon as a new AOI is promulgated and do not constitute final agency action reviewable by the courts.  *Id.* at 29-33.

---

[2]  The August date only included the Forest Service and WDEQ.

Finally, regarding CNE's CWA claim, the Forest Service argues that because all of the Pole Mountain ten-year grazing permits were issued by June 22, 2002, and the first evidence of fecal coliform violations came on November 22, 2002, the Forest Service's issuance of grazing permits could not have been arbitrary or capricious. *Id.* at 34. The permits and AMPs included BMPs specifically recognized by Wyoming's Nonpoint Source Management Plan as appropriate for livestock grazing. *Id.* at 35. Because Wyoming "will not take enforcement action against a nonpoint source discharger who is implementing BMPs in good faith, even where an exceedance of water quality standards is demonstrated," the Forest Service has not violated Wyoming state quality standards. *Id.* at 36. Indeed, the Forest Service notes that WDEQ, the state regulatory agency in charge of ensuring compliance with the fecal coliform standard "believes the Forest Service's actions are reasonable and consistent with its Nonpoint Source Management Plan." *Id.* at 38.

Although the Forest Service has reduced stock numbers at the Crow Creek allotment, it has admittedly not eliminated exceedances. *Id.* at 39. However, the level of contamination has been reduced. *Id.* The Forest Service notes that its "judgment is not perfect, and that it may take some time to determine the best suite of BMPs to address any problems that arise in the management of nonpoint sources." *Id.* at 40. Thus, the agency is not acting arbitrarily or capriciously with regard to the grazing permits in Pole Mountain. In fact, if the Court were to grant the requested relief and end grazing altogether, the state agencies and the Forest Service would be unable to

determine the appropriate level of grazing through a process of trial and error. *Id.* at 40-41.

### B.   ESA Claim

The Forest Service first notes that the Preble's meadow jumping mouse's place on the endangered species list is in question. After publishing a "90-day Finding for a Petition to De-list the Preble's Meadow Jumping Mouse" on March 31, 2004, 69 Fed. Reg. 16944 (Mar. 31, 2004), the FWS issued its finding recommending de-listing. 70 Fed. Reg. 5404 (Feb. 2, 2005). A final decision will be made by February 2, 2006. Forest Serv. Resp. at 10.

Procedurally, the Forest Service argues that CNE's ESA claim should fail for not giving notice in its Complaint of a claim regarding grazing impact on mouse recovery, *id.* at 42-43, and failing to exhaust administrative remedies. *Id.* at 44.

Regardless, the Forest Service alleges that it fulfilled its consultation duties. *Id.* at 46. The Forest Service's Response lists its informal consultations with FWS regarding the mouse. *Id.* at 22-25. Specifically, FWS agreed with the Forest Service in both 1998 and 2003 that livestock grazing was "not likely to adversely affect" the mouse. *Id.* at 23. On January 12, 2005, FWS again concurred with the Forest Service's "not likely to adversely affect" determination pertaining specifically to critical habitat for the mouse. *Id.* at 25. The Forest Service denies that any grazing modification or new information requires reconsideration in this case. *Id.* at 52-53.

The Forest Service defends its measurement of forage utilization standards at the allotment level rather than at key areas, arguing that "key areas . . . inaccurately

14

portray the overall condition of the pasture or allotment." *Id*. at 54.  The agency has discretion in "deciding how to best assess the impacts of the decisions it undertakes." *Id*. at 55 (citing *Wyoming v. United States*, 279 F.3d 1214, 1240 (10th Cir. 2002) (judicial deference to agency decisions in the context of technical or scientific matters).

## IV.     CATTLEMEN RESPONSE

The Cattlemen argue that 1) good-faith use of BMPs means the Forest Service is in compliance with Wyoming state law, Cattlemen Resp. at 18-19; and 2) the Forest Service did reconsult as required.  *Id*. at 20.  Additionally, the Cattlemen emphasize that the first time the Forest Service knew of the fecal coliform problem was in 2002; thus earlier action may not be challenged as arbitrary or capricious.  *Id*. at 17.

## V.     WACD RESPONSE

WACD responds only to CNE's first claim, under the CWA.  WACD notes that the Forest Service and WDEQ have been working together for many years to control nonpoint source pollution through BMPs.  WACD Resp. at 4-5.  Wyoming statutory provisions specifically dictate that BMPs must take into account the social and economic value of the pollution source, and must allow reasonable time for compliance.  *Id.* at 17 (citing Wyo. Stat. Ann. § 35-11-302(a)(vi) and (vii)).  WACD argues that CNE's reading of Wyoming's water quality laws interprets the fecal coliform standard as strict liability.  *Id*. at 18.

Procedurally, WACD also argues that CNE has failed to challenge a discrete, final agency action, *id.* at 26-27; failed to exhaust administrative remedies and that exhaustion is not futile, *id.* at 31; and that plaintiffs lack standing.  *Id.* at 32-35.

## VI.     PETITIONER'S REPLY

CNE argues that AOIs are final agency actions as they determine obligations with legal effects by "clearly and concisely outlin[ing] the permittee's and the Forest Service's obligations for the year." Reply at 3. Adopting a contrary view, such as that suggested by the District of Oregon in *Oregon Natural Desert Ass'n v. U.S. Forest Service*, 2005 WL 1334459 (D. Or., June 3, 2005), would render AOIs immune to challenge, even by permittees. Reply at 7. CNE argues that mootness does not apply here, as a live controversy exists as to whether the Forest Service can issue AOIs despite documented water quality violations. Reply at 8-9. Additionally, CNE is challenging an unlawful pattern and practice and the behavior is capable of repetition and of evading judicial review. *Id.* at 9.

Regardless of Wyoming's good faith BMP standard, CNE argues that the Forest Service's violation of the fecal coliform standard means the agency is violating § 313 of the CWA, which requires federal agencies to comply with "all" aspects of state water quality laws, including the fecal coliform standard at issue. *Id.* at 13 (quoting 33 U.S.C. § 1323(a)(1)).

CNE argues that the ESA citizen suit provision does not require exhaustion like the APA. *Id.* at 16. Also, CNE asserts that it submitted two 60-day notice letters, both of which named the Center for Native Ecosystems. *Id.* at 17. Finally, CNE argues that the § 7 notice of intent to sue implicitly included recovery issues, as § 7 consultation requires one to consider recovery. *Id.* at 18.

**VII.   ANALYSIS**

This Court will not revisit the jurisdictional and procedural issues discussed in its Order denying motions to dismiss. The following discussion reflects an analysis of the merits of CNE's Petition.

The standard of review under the Administrative Procedures Act requires a court to limit itself to the determination of whether the agency action was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." *Utah Envtl. Cong. v. Bosworth*, 421 F.3d 1105, 1109 (10th Cir. 2005). This deferential level of review means that "administrative decisions may be set aside only for substantial procedural or substantive reasons, and the court cannot substitute its own judgment for that of the agency." *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1164 (10th Cir. 2002) (internal citations omitted). The Supreme Court explains that a court may review to determine whether the agency

> has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Here, the Forest Service relied on factors specifically authorized by the Wyoming standards (*e.g.*, social and economic considerations as contemplated by Wyo. Stat. Ann. § 35-11-302(a)(vi)) and on the FWS concurrence that grazing was not likely to adversely impact the mouse or its habitat. Its explanation, while perhaps not emphasizing the pollution evidence as CNE would like, is not completely "counter" to

the evidence before it, as the Forest Service has determined that only small areas within Pole Mountain are affected (specifically two creeks).  Additionally, the Forest Service has not set forth any entirely implausible rationale, but rather is working with local conservation districts to address the specific pollution issue.  Forest Serv. Resp. at 21.

The Forest Service appears to be complying with state water quality standards "to the same extent as any nongovernmental entity" as required by § 313 of the CWA, as Wyoming provisions allow that more than a violation of a water quality standard is required to justify enforcement.  *See* Ch. 1 § 5, Wyoming Water Quality Standards (discussing possible enforcement action if no BMP has been issued).

Regarding the ESA claim, the two sides dispute whether a reconsultation was required in this case and whether an adequate reconsultation actually took place.  In light of the applicable standard of review–the APA's arbitrary and capricious standard as described above–the Court finds that the Forest Service has set forth reasonable and uncontradicted explanations for its informal consultation with FWS, especially considering the FWS concurrences and the possible de-listing of the mouse by February 2006.

The Court notes CNE's concern that the Forest Service changed its forage utilization measurement standards after this lawsuit was filed from measuring key areas to averaging across an allotment.  Again, however, the deferential level of review leads to a conclusion that the Forest Service's use of allotment-level utilization measurements is neither arbitrary nor capricious.  Although it comes after the filing of

this lawsuit, the administrative record reflects the Forest Service's caution in measuring at key areas, which may "inaccurately portray the overall condition of the pasture or allotment." AR Vol. XV at 7757 (Report to FWS); *see also Utah Envtl. Congress*, 421 F.3d at 1109-10 ("the agency, not the reviewing court, is entrusted with the responsibility of considering the various modes of scientific evaluation and theory and choosing the one appropriate for the given circumstances") (internal quotations omitted). The administrative record also includes a letter from October 19, 1998, well before the present litigation, suggesting that the utilization standard was originally intended to be measured at the allotment level. *See* AR Vol. XV at 7494 (Letter to FWS) (describing the utilization standard as "how we manage the *allotments* on Pole Mountain") (emphasis added). The Forest Service's reliance on "other indicators of riparian health" as well as photopoint data in its decision to measure at the allotment rather than key area level satisfies the Forest Service's burden under *Exxon*, 970 F.2d at 762 n.4, to supply a reasoned analysis for any change in policy. *See* AR Vol. XV at 7757 (Report to FWS); Forest Serv. Resp. at 54 (citing AR Vol. XIV at 7142-7160).

**VIII.   CONCLUSION**

The Petition for Review be DENIED for failing to prove arbitrary and capricious action on the part of the Forest Service.

DATED: January 9, 2006    BY THE COURT:

*s/ Phillip S. Figa*
_____
Phillip S. Figa
United States District Court Judge